**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**MIDLAND-ODESSA DIVISION**

| | | |
|---|---|---|
| KEY ENERGY SERVICES, INC. AND | § | |
| KEY ENERGY SERVICES, LLC, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO._1:21-CV-00714___ |
| | § | |
| CLARENCE BERTRAND AND AXIS | § | |
| ENERGY SERVICES, LLC, | § | |
| | § | |
| *Defendants*. | § | |

## ORIGINAL COMPLAINT

Plaintiffs Key Energy Services, Inc. and Key Energy Services, LLC (collectively, the "Company," "KES," or "Plaintiff"), by and through its undersigned attorneys, files this Original Complaint against Clarence Bertrand ("Bertrand") and Axis Energy Services, LLC ("Axis") (collectively, "Defendants"):

## NATURE OF THE ACTION

1. In the two weeks before his resignation to join Axis as a vice president, Bertrand misappropriated from KES, his then-employer, approximately 2,232 files containing KES's confidential and trade secret information.  He violated his confidentiality agreement with KES[1] and state and federal law protecting trade secrets. Axis hired Bertrand in spite of his non-compete obligations to KES, which preclude him from competing with KES in certain territories that are stated in the Key Energy Services, Inc. Equity and Cash Incentive Plan Time-Vested Restricted Stock Unit Award

---

[1] *See* Exhibit A-1, Key Energy Services, Inc. 2019 Equity and Cash Incentive Plan Time-Vested Restricted Stock Unit Award Agreement (Feb. 4, 2019).

Agreement (the "Agreement") Bertrand signed in 2019.[2]   Nevertheless, it appears that Bertrand is working for Axis in those geographic regions, most significantly, in the Permian and Haynesville Basins.  Bertrand further violated the Agreement's covenants when he solicited KES's employees.

2.     KES now sues Bertrand and Axis to protect its trade secret information under the Defend Trade Secrets Act, 18 U.S.C. § 1836, and the Texas Uniform Trade Secrets Act, TEX. CIV. PRAC. & REM. CODE § 134A.001, *et seq*.  KES also sues Bertrand for breach of the Agreement, and Axis for tortious interference with the Agreement.  KES seeks injunctive relief to protects its trade secrets, and enforce the terms of the Agreement.

## THE PARTIES

3.     Key Energy Services, Inc. is a Delaware corporation that maintains its principal place of business at 1500 Citywest Blvd., Suite 800, Houston, Texas 77042.

4.     Key Energy Services, LLC is a domestic limited liability company located at 1500 Citywest Boulevard, Suite 800, Houston, Texas 77042-2380.

5.     Clarence Bertrand is an individual whose last known address is 7117 Shaddock Ridge, Tyler, Texas 75703.  Bertrand may be served with process at such address.  Service is requested at this time.

6.     Axis Energy Services, LLC is a domestic limited liability company located at 851 West Harrison Road, Longview, Texas 75604.  Axis may be served with process

---

[2] The Agreement included confidentiality, non-disclosure, non-competition, and non-solicitation covenants. *See* Exh. A-1.

through its registered agent, Capitol Corporate Services, Inc., 206 East 9th Street, Suite 1300, Austin, Texas 78701-1300.  Service is requested at this time.

## JURISDICTION AND VENUE

7.     The Court has original jurisdiction of this matter pursuant to 28 U.S.C. § 1331, because this action involves a claim arising under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C § 1836.

8.     This Court has supplemental jurisdiction over this matter to the extent it involves state law claims, pursuant to 28 U.S.C. § 1367.  Such claims upon which this Complaint are premised are so closely related to the DTSA claim, that they are part of the same case and controversy.

9.     This Court has authority to award the requested temporary restraining order and preliminary injunction under Federal Rule of Civil Procedure 65(a), (b).  *See also* 28 U.S.C. § 1651.

10.     This Court has personal jurisdiction over Bertrand because he committed wrongful conduct in the Western District of Texas, specifically in Midland/Odessa, Texas, when he misappropriated KES's trade secrets.  Based on Bertrand's conduct and employment with KES in the Midland/Odessa, Texas market, it was foreseeable that Bertrand would be required to appear to respond to KES's claims in the United State District Court for the Western District of Texas.

11.     This Court has personal jurisdiction over Axis because it is a Texas based company, engaged in business in the Western District of Texas, and it engaged in a tort in

this District when it hired Bertrand in violation of the Agreement. Axis's conduct was purposefully directed toward the forum State of Texas.

12.    KES employed Bertrand to work in the Permian Basin, and hired him to work in Midland/Odessa. Based on the conduct of Bertrand and Axis, it was foreseeable that Bertrand and Axis would be required to appear to respond to KES's claims in the United States District Court for the Western District of Texas.

13.    Venue is proper in the United States District Court for the Western District of Texas pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims in this action occurred in this judicial district.

## FACTUAL BACKGROUND

### A.    <u>Bertrand's Employment with the Company</u>.

14.    KES is comprised of numerous entities, including Key Energy Services, Inc., and its wholly owned subsidiary, Key Energy Services, LLC.[3]   Key Energy Services, Inc. is a publicly traded company on the OTC.[4]   Key Energy Services, LLC is the entity through which KES employs its workforce, including its former employee, Bertrand.[5]

15.    KES provides energy production solutions and services for exploration and production companies.[6]   It specializes in oil and gas well servicing, which includes, but is

---

[3] *See* Exh. A, Decl. of Turner Phipps ¶ 2 (Aug. 16, 2021).
[4] *See* Exh. A ¶ 3.
[5] *See* Exh. A ¶ 3.
[6] *See* Exh. A ¶ 6.

not limited to, workovers, cementing, completing, and acidizing wells.[7]  KES operates in Texas, California, Colorado, Louisiana, Montana, New Mexico, North Dakota, Oklahoma, Pennsylvania, Utah, West Virginia, and Wyoming, and is headquartered in Houston, Texas.[8]

16.    In 2017, KES hired Bertrand to work as a Service Manager, Cementing for Key Energy Services, Inc.[9]  Bertrand's position was based out of Midland/Odessa.[10]  In 2019, KES changed Bertrand's position to Area Director of Key Energy Services, LLC.[11]  Bertrand's position was based out of the Permian Basin Marketplace.[12]  The Permian Basin expands across West Texas and Southeast New Mexico.[13]  KES's Permian Basin headquarters are currently located in Odessa, Texas.[14]  Midland, Texas is located in Midland County.  Odessa, Texas is located in Ector County.

17.    As Area Director, Bertrand was responsible for the Company's Permian Basin plugging and abandonment ("P&A"), remedial cementing, and acidizing services business.[15]  Bertrand was a specialist in remedial cementing and provided technical guidance outside of the Permian Basin.[16]  In 2020, Bertrand assumed additional responsibility for the Company's Permian Basin completions business.[17]

---

[7] *See* Exh. A ¶ 6.
[8] *See* Exh. A ¶ 6.
[9] *See* Exh. A ¶ 8.
[10] *See* Exh. A ¶ 8.
[11] *See* Exh. A ¶ 9.
[12] *See* Exh. A ¶ 9.
[13] *See* Exh. A ¶ 5.
[14] *See* Exh. A ¶ 7.
[15] *See* Exh. A ¶ 9.
[16] *See* Exh. A ¶ 9.
[17] *See* Exh. A ¶ 9.

18.     Bertrand lived in Tyler, Texas, but his KES office was located in Midland.[18]  He spent approximately ten out of every fourteen days working out of the Company's Midland office and/or elsewhere in the Permian Basin.[19]

**B.     KES's Trade Secrets.**

19.     The Company develops and maintains confidential and proprietary information and trade secrets that are essential to the successful operation and course of conducting its business (the "Confidential Information and Trade Secrets").[20]  This information includes, but is not limited to, documents and information related to or reflecting: (a) the Company's processes and procedures for performing our services; (b) Company customer lists, contact information, data about customer spend and revenue, and prospective customer lists and contact information; (c) lists and information about the Company's vendors and suppliers associated with materials and expenses; (d) financial information about KES operations, including KES  pricing information and strategy, bids and bid methodologies, expenses, labor costs, and personnel information; and (e) KES business plans and commercial strategies.[21]

20.     KES's Confidential Information and Trade Secrets give it a competitive advantage that the Company protects through various policies and procedures.[22]  KES protects its Confidential Information and Trade Secrets by, among other things: password protecting Company computers, requiring new hires to review and acknowledge the KES

---

[18] *See* Exh. A ¶ 9.
[19] *See* Exh. A ¶ 9.
[20] *See* Exh. A ¶ 18.
[21] *See* Exh. A ¶ 18.
[22] *See* Exh. A ¶ 19.

handbook and code of conduct that address the handling of KES confidential information and intellectual property, requiring password protected access to KES servers, restricting file access for sensitive documents, maintaining and abiding by a delegation of authority matrix for sensitive documents and information, controlling access to KES office space by badges and keys, and requiring employees to tender all KES property upon termination.[23]

21.    Upon joining the Company, Bertrand executed (a) an acknowledgement of his receipt and agreement to abide by Company policies set forth in the Company handbook; and (b) an acknowledgement to abide by the Company's code of conduct.[24] A true and correct copy of each acknowledgement is attached hereto as Exhibit A-2, and is incorporated by reference herein.

22.    Throughout Bertrand's tenure of employment with the Company, the Company entrusted him with access to the Company's Confidential Information and Trade Secrets.[25]

**C.    The Agreement.**

23.    In 2019, Bertrand signed the Agreement in connection with the Company issuing him Key Energy Services, Inc. stock awards.[26] A true and correct copy of the Agreement is attached to the Complaint as Exhibit A-1, and is incorporated by reference herein.

---

[23] *See* Exh. A ¶ 19.
[24] *See* Exh. A ¶ 20; *see also* Exh. A-2, Employee Acknowledgement and Consent (Jun. 29, 2017) and Certificate of Compliance (Jun. 29, 2017).
[25] *See* Exh. A ¶ 21.
[26] *See* Exh. A ¶ 12; *see also* Exh. A-1.

24.     Among other things, the Agreement included covenants Bertrand made to

protect and not utilize post-employment any of KES's Confidential Information.[27]

---

[27] *See* Exh. A-1 p. 11 ¶ 3.  The Agreement defines Confidential Information as:

> **3. Definition of Confidential Information**. As used herein, "**Confidential Information**" means all non-public or proprietary information of, or related to, the Company or any of its subsidiaries, including, without limitation, all designs, ideas, concepts, improvements, product developments, discoveries and inventions, whether patentable or not, that (i) are acquired by or disclosed to the Participant during the period that the Participant is or has been employed or affiliated with the Company or any of its subsidiaries (whether acquired or disclosed during business hours or otherwise and whether acquired or disclosed on the Company's premises or otherwise) or (ii) relate to the businesses or properties, products or services of the Company or any of its subsidiaries (including all such information relating to technical information, including engineering and scientific research, development, methodology, devices and processes; formulas and chemical compositions; blueprints, designs and drawings; financial information, budgets, projections and results; business and marketing plans, strategies, and programs; employee and contractor lists and records; business methods, and operating and production procedures; pricing, sales data, prospect and customer lists and information; supplier and vendor lists and information; terms of commercial contracts, as well as all such information relating to corporate opportunities, operations, future plans, methods of doing business, business plans, strategies for developing business and market share, research, financial and sales data, pricing terms, evaluations, opinions, interpretations, acquisition prospects, the identity of customers or acquisition targets or their requirements, the identity of key contacts within customers' organizations or within the organization of acquisition prospects, or marketing and merchandising techniques, prospective names and marks). Moreover, all documents, presentations, drawings, memoranda, notes, records, files, correspondence, manuals, models, specifications, computer programs, e-mail, voice mail, electronic databases, maps, data, models and all other writings or materials of any type including or embodying any Confidential Information shall be the sole and exclusive property of the Company or any of its subsidiaries and is subject to the same restrictions on disclosure applicable to all Confidential Information as set forth above. Confidential Information does not include any information that is or becomes generally available to the public other than as a result of a disclosure or wrongful act of the Participant or any of the Participant's agents or which was known to Executive prior to his employment with the Company.

*Id.*

Bertrand also agreed to non-compete and non-solicitation obligations.[28]  Specifically, the Agreement:

      a.      Prohibits Bertrand from "disclos[ing] any Confidential Information to any person or entity and [from] us[ing] any Confidential Information except for the benefit of the Company or its subsidiaries or with the express written consent of the Chief Executive Officer or the General Counsel of the Company;"[29]

      b.      Requires Bertrand, upon the termination of his employment from KES, to "promptly surrender and deliver to the Company all documents (including electronically stored information) and all copies thereof and all other materials of any nature containing or pertaining to all Confidential Information" in Bertrand's "possession, custody or control" and prohibits Bertrand from "retain[ing] any such document or other materials or property;"[30]

      c.      For a period of twelve (12) months following the termination of Bertrand's employment, the Agreement, prohibits Bertrand from competing in the Market Area with KES,[31] appropriating Business Opportunities[32] from KES in the

---

[28] *See* Exh. A-1 pp. 10–14.

[29] *See* Exh. A-1 p. 10 ¶ 1.

[30] *See* Exh. A-1 p. 13–14 ¶ 5.

[31] *See* Exh. A-1 p. 12 ¶ 4.b.i.  The Agreement defines "Market Area" as:

"**Market Area**" means: onshore land areas in the Continental United States in (a) each county in which [Bertrand] was based or performed material services on behalf of the Company or any of its subsidiaries; and (b) each of the following basins and oil and gas shale plays: **Bakken**, Barnett, Denver-Julesberg, **Eagle Ford**, Fayetteville, Granite Wash, **Haynesville**, Marcellus, Mississippi Lime, Niobrara, Permian, **Powder River**, SCOOP, STACK, Tuscaloosa, Williston, and Woodford; *provided, however*, a basin or play shall not be included within the Market Area if: (1) the Participant had no direct or indirect responsibilities with

Market Area,[33] soliciting customers or suppliers with whom Bertrand had contact in the last twenty-four months of Bertrand's employment; [34] and

      d.    Prohibits Bertrand from soliciting, canvassing, approaching, encouraging, enticing or inducing any KES employee or contractor to terminate their employment or engagement with KES.[35]

---

respect to such basin or play during the last 24 months of the Participant's employment or engagement with the Company or any of its subsidiaries, or (2) the Participant obtained no Confidential Information with respect the Company's or any of its subsidiaries' Business in such basin or play.

*Id.* p. 13 ¶ 4.c.iii (emphasis added).

[32] The Agreement defines "Business Opportunities" and "Business" as follows:

    i. "**Business**" means the business and operations that are the same or similar to those performed by the Company or any of its subsidiaries and for which the Participant obtained Confidential Information or had direct or indirect responsibilities during the period of the Participant's employment with the Company or any of its subsidiaries, which business and operations include (if Participant obtained Confidential Information or had direct or indirect responsibilities with respect to such business and operations on behalf of the Company or any of its subsidiaries during the period of his or her employment): rig-based and coiled tubing-based well maintenance and workover services, well completion and recompletion services, fluid management services, and fishing and rental services.

    ii. "**Business Opportunity**" shall mean any commercial, investment or other business opportunity relating to the Business.

*See* Exh. A-1 p. 13 ¶ 4.c.i–ii .
[33] *See* Exh. A-1 p. 12 ¶ 4.b.ii.
[34] *See* Exh. A-1 p. 12 ¶ 4.b.iii.
[35] *See* Exh. A-1 p. 12 ¶ 4.b.iv.

**D.**    **Bertrand's Joins Axis and Violates the Non-Compete and Non-Soliciation Covenants.**

25.    On August 2, 2021, Bertrand resigned from KES and advised that he had accepted a position with Axis. [36]   August 2, 2021 was his last day at KES.[37]   Upon information and belief, Bertrand currently works as a vice president of Axis.[38]

26.    Axis and KES are direct competitors.[39]  Axis specializes in oil and gas well servicing.[40]  This includes, but is not limited to workovers, cementing, completing, and acidizing wells.[41] While KES is a larger company than Axis, KES and Axis have a similar structure and product offering. [42]  Axis operates in many states across the country, and has a large presence in the Permian.[43]   Upon information and belief, Axis maintains an operational presence in East Texas (Haynesville), South Texas (Eagle Ford), North Dakota (Bakken), Oklahoma (SCOOP / STACK), Ohio (Marcellus), Pennsylvania (Marcellus), and West Virginia (Marcellus).[44]

27.    To date, two KES employees have informed Turner Phipps, KES Vice President of the Permian Basin, that Bertrand attempted to solicit them to work at Axis or encouraged them to leave KES for Axis: (1) a Company District Manager informed Phipps that Bertrand asked him if he was interested in working with Bertrand at Axis; and (2) a Company Senior Service Supervisor informed Phipps that Bertrand advised him

---

[36] *See* Exh. A ¶ 14.
[37] *See* Exh. A ¶ 14.
[38] *See* Exh. A ¶ 15.
[39] *See* Exh. A ¶ 13.
[40] *See* Exh. A ¶ 13.
[41] *See* Exh. A ¶ 13.
[42] *See* Exh. A ¶ 13.
[43] *See* Exh. A ¶ 13.
[44] *See* Exh. A ¶ 13.

that the Company did not value him as an employee and that Bertrand invited him to work at Axis.[45]  Phipps encouraged these employees to remain with KES.[46]  Two additional KES employees, a Company District Manager of Cementing and a Senior Supervisor, advised Phipps that they had no intention of following Bertrand to Axis, and Phipps encouraged these employees to remain at KES.[47] Phipps understood their comments to mean that Bertrand extended the invitation for them to join him at Axis.[48]

28.    The facts demonstrate Bertrand is performing work for Axis in violation of his non-compete obligations to KES.  The Agreement defines "Market Area" for purposes of the non-compete to include the Permian Basin and the counties in which Bertrand performed material services for KES.[49]

29.    The Permian Basin affects Andrews, Borden, Brewster, Cochran, Coke, Concho, Cottle, Crane, Crockett, Crosby, Culberson, Dawson, Dickens, Ector, Edwards, El Paso, Fisher, Floyd, Gaines, Garza, Glasscock, Hale, Hockley, Howard, Hudspeth, Irion, Jeff Davis, Loving, Lubbock, Lynn, Martin, McCulloch, Midland, Mitchell, Motley, Nolan, Pecos, Reagan, Reeves, Schleicher, Scurry, Sterling, Stonewall, Sutton, Terrell, Terry, Tom Green, Upton, Val Verde, Ward, Winkler, and Yoakum counties in Texas and Eddy and Lea counties in New Mexico.[50]

---

[45] *See* Exh. A ¶ 16.
[46] *See* Exh. A ¶ 16.
[47] *See* Exh. A ¶ 17.
[48] *See* Exh. A ¶ 17.
[49] *See, infra*, note 31.
[50] *See* Exh. A ¶ 5.

30.     Bertrand appears to be working for Axis in the Permian Basin based on at least two facts: (i) he solicited KES Permian Basin-based employees to join Axis;[51] and (ii) many of the 2,232 files he stole relate to KES's operations in the Permian.[52]

31.     Based on the Agreement, Bertrand should also be barred from competing against KES in the other geographic territories for which he worked while at KES.[53] Specifically, in addition to the Permian Basin, Bertrand:

     a.     Was involved in proposing cementing projects in East Texas (Haynesville Basin) and South Texas (Eagle Ford Basin and Brazos River Valley Basin) in or about the spring of 2021;[54]

     b.     Was involved in assessing projects in Wyoming (Powder River Basin) in or about the spring of 2020;[55]

     c.     Was involved in assessing projects in North Dakota (Bakken Basin) in or about April 2020.[56]

     d.     Provided technical assistance and expertise to KES's area salt water disposal manager for a saltwater disposal well project in East Texas (Haynesville Basin) in or about April, May, and July of 2019;[57] and

---

[51] *See* Exh. A ¶ 16; *see also* ¶ 17.
[52] *See* Exh. A ¶ 22.
[53] *See* Exh. A ¶ 10–12.
[54] *See* Exh. A ¶ 10.a.
[55] *See* Exh. A ¶ 10.b.
[56] *See* Exh. A ¶ 10.c.
[57] *See* Exh. A ¶ 11.a.

e.      Provided technical assistance and expertise to KES's area salt water disposal manager for a saltwater disposal well in Webb County, Texas in or about March 2020.[58]

**E.      Bertrand's Misappropriation of KES's Confidential Information and Trade Secrets.**

32.      Following Bertrand's resignation, the Company retained RICOH USA ("RICOH") to conduct a forensic analysis of his Company issued mobile phone and the laptop ("Laptop") that Bertrand used from approximately March 2021 until his resignation on August 2, 2021.[59]

33.      RICOH discovered the following critical facts:

a.      Bertrand used five USB flash drives with his Laptop between April 1, 2021 and July 31, 2021.[60]

b.      Two USB flash drives were first connected and last connected to his computer on Saturday, July 31, 2021[61]—two days before Bertrand resigned.

c.      Two USB flash drives were last connected and last removed on July 14, 2021.[62]

d.      ***Approximately 2,232 files were taken from the computer onto the USB flash drives on July 14 and 31, 2021***.[63]

---

[58] *See* Exh. A ¶ 11.b.
[59] *See* Exh. A ¶ 22.
[60] *See* Exh. B ¶ 6. All [5] USB flash drives were connected by the Microsoft user "cbertrand." *See id.*
[61] *See* Exh. B ¶ 6.
[62] *See* Exh. B ¶ 6.
[63] *See* Exh. B ¶ 7.  RICOH discovered forensic artifacts on the Laptop that "show that at least forty-four . . . files and folders were copied to removable media."  *See id.*  "There is no known

34.    A sample of the copied 2,232 file/folder details are listed below: [64]

    a.    Folder: D:\Expense File

        i.    Date Copied to Removable Media: July 31, 2021

        ii.    Removable      Media:      USB      DISK      2.0, Serial #: 070192E05BB2A629

    b.    Folder: D:\Operations

        i.    Date Copied to Removable Media: July 31, 2021

        ii.    Removable      Media:      USB      DISK      2.0, Serial #: 070192E05BB2A629

    c.    Folder: D:\Customer Info

        i.    Date Copied to Removable Media: July 31, 2021

        ii.    Removable      Media:      USB      DISK      2.0, Serial #: 070192E05BB2A629

    d.    Folder: D:\Cost Bucket

        i.    Date Copied to Removable Media: July 31, 2021

        ii.    Removable      Media:      USB      DISK      2.0, Serial #: 070192E05BB2A629

    e.    Folder: D:\Cement Notes

        i.    Date Copied to Removable Media: July 31, 2021

        ii.    Removable      Media:      USB      DISK      2.0, Serial #: 070192EF2BEAA862

---

log file on the [Laptop] that stores information about" the specific files copied to USB flash drives.  *See id.*  A forensic examination of the flash drives themselves is required to determine all data copied.  *See id.*  RICOH discovered that the "folder structure and the folder names found copied to the" flash drives matched the "folder structure and folder names found on the local drive for the [L]aptop."  *See id.*  RICOH used "this folder structure and folder names" to determine that "it is probable that the [flash drives] contain[] approximately 2232 files with the bulk of the files coming from one directory named and located at 'C:\Users\cbertrand\Documents\My Documents\'."  *See id.*

[64] *See* Exh. B ¶ 7.

      f.      Folder: D:\Personal

            i.      Files Accessed: SalNW.xlsx, Key Numbers.xlsx

            ii.      Date Copied to Removable Media: July 31, 2021

            iii.      Removable Media: USB DISK 2.0, Serial #: 070192EF2BEAA862

      g.      Folder: D:\Call Sheets

            i.      Subfolders Include: Bluestone, Chevron, Endeavor, Kinder Morgan, OXY, Past Data, Pioneer, Shell WPX, XTO

            ii.      Date Copied to Removable Media: July 31, 2021

            iii.      Removable Media: USB DISK 2.0, Serial #: 070192EF2BEAA862

      h.      Folder: D:\My Documents

            i.      Subfolders Include: Clay Erwin, Completion Bucket, Operations, Customer Info, Cost Bucket, Cement Notes, Call Sheets

            ii.      Date Copied to Removable Media: July 14, 2021

            iii.      Removable Media: General UDisk, Serial #: 1404291539352803987500

      i.      Folder: D:\My Documents\Personal

            i.      File Accessed: BertrandNet2.xlsx

            ii.      Date Copied to Removable Media: July 14, 2021

            iii.      Removable Media: General UDisk, Serial #: 000000000000020C[65]

35.    KES reviewed RICOH's analysis and uncovered significant Confidential Information and Trade Secrets in the file/folders that Bertrand misappropriated.

36.    For example, in the "Cement Notes" folder, KES discovered the following:

---

[65] *See* Exh. B ¶ 7.

a.     KES's proprietary common operating guidelines ("COGs").[66]  KES developed their COGs for the purpose of documenting its best practices and business procedures.[67]   COGs include detailed information about how KES performs its services.[68]   KES put forth significant resources to develop its COGs for their sole use by KES employees. [69]   KES's COGs give the Company a strategic advantage in the marketplace. [70]

b.     Financial information related to KES's profit and loss statements, customer mix, and pricing strategies for their cementing business. [71]

c.     Personnel information for cementing employees in the Permian Basin. [72]  This information includes, but is not limited to, employee names, roles, hire dates, statuses, annual salaries, and changes in salaries.[73]

d.     A business case with financial performance of the KES cementing business.[74]  The business case reflects profits, losses, and revenues by customer for 2018.[75]  It further reflects the business strategies KES planned to undertake by

---

[66] *See* Exh. A-1 ¶ 23.a.
[67] *See* Exh. A-1 ¶ 23.a.
[68] *See* Exh. A-1 ¶ 23.a.
[69] *See* Exh. A-1 ¶ 23.a.
[70] *See* Exh. A-1 ¶ 23.a.
[71] *See* Exh. A-1 ¶ 23.b.
[72] *See* Exh. A-1 ¶ 23.c.
[73] *See* Exh. A-1 ¶ 23.c.
[74] *See* Exh. A-1 ¶ 23.d.
[75] *See* Exh. A-1 ¶ 23.d.

customer for 2019 and revenue projections by customer.[76]   The case reflects customer mix, revenue, and KES's business strategies.[77]

37.    The "Call Sheets" file/folder contains, among other things: directions to a customer wells, the well plugging specifications and processes, customer names, phone numbers, and KES's work history by customer.[78]

38.    The "Completion Bucket" file/folder contains KES Confidential Information and Trade Secrets including, but not limited to: [79]

    a.    Personnel information for completion employees in the Permian Basin.[80]  This information includes, but not limited to, employee names, roles, hire dates, statuses, annual salaries, and changes in salaries.[81]

    b.    Logs of ongoing work for KES customers and the labor employed at each site.[82]  This information includes an organizational chart and staffing strategy for the completion yard.[83]

    c.    Month-over-month profit and loss statements, from August 2019 through 2021, for KES's completions business; and monthly profit and loss statements dated as recently as May 2021.[84]

---

[76] *See* Exh. A-1 ¶ 23.d.
[77] *See* Exh. A-1 ¶ 23.d.
[78] *See* Exh. A-1 ¶ 24.
[79] *See* Exh. A-1 ¶ 25.
[80] *See* Exh. A-1 ¶ 25.a.
[81] *See* Exh. A-1 ¶ 25.a.
[82] *See* Exh. A-1 ¶ 25.b.
[83] *See* Exh. A-1 ¶ 25.b.
[84] *See* Exh. A-1 ¶ 25.c.

d.    Copies of KES's monthly financial reports that KES circulates among its management teams.[85]

e.    Pricing sheets for KES's cementing materials and equipment.[86]

f.    KES vendor receipts, which reflect pricing information.[87]

g.    Daily revenue reports, by customer, from September 2020 through July 2021.[88]  These breakdowns include customer weight, which reveals how much each customer contributes to KES's monthly revenue.[89]

h.    Numerous proposals KES submitted to active customers.[90]  While Bertrand oversaw KES's Permian Basin P&A, remedial cementing, acidizing services, and completions business lines (in addition to providing cementing technical expertise across the Company), the information contained herein covers numerous other KES business lines and reflects: rates, line item proposals, inspection rates, equipment rates, terms and conditions, and collection terms. [91] Customers who receive KES proposals understand that the information contained therein is confidential, proprietary, and trade secret to KES.[92]  One proposal within the "Customers" subfolder is dated as recently as April 2021. [93]

---

[85] *See* Exh. A-1 ¶ 25.d.
[86] *See* Exh. A-1 ¶ 25.e.
[87] *See* Exh. A-1 ¶ 25.f.
[88] *See* Exh. A-1 ¶ 25.g.
[89] *See* Exh. A-1 ¶ 25.g.
[90] *See* Exh. A-1 ¶ 25.h.
[91] *See* Exh. A-1 ¶ 25.h.
[92] *See* Exh. A-1 ¶ 25.h.
[93] *See* Exh. A-1 ¶ 25.h.

i.      Project AFE Requests ("PARs"), which track KES's spend by project.[94]  These documents reflect labor and material costs with a breakout of the totals by rig and year, comments on customers, and the split of internal versus external labor.[95]

39.      KES will suffer immediate and irreparable harm if Bertrand is not enjoined from using the Confidential Information and Trade Secrets that he misappropriated from Plaintiff.[96]

## CLAIMS FOR RELIEF

### COUNT I – BERTRAND AND AXIS
### Violation of the Defend Trade Secrets Act
### 18 U.S.C. § 1836, et. seq.

40.      KES incorporates by reference the preceding paragraphs of this Original Complaint as if the same were forth in full herein.

41.      KES owns valuable trade secrets which KES has spent significant resources developing.

42.      The trade secrets are kept confidential and not publicly disclosed.

43.      KES afforded Bertrand access to and use of its trade secrets in the course of his employment with KES.

44.      The trade secrets to which Bertrand had access are related to KES's services and products that are used in, or intended for use in, interstate commerce.

---

[94] *See* Exh. A-1 ¶ 25.i.
[95] *See* Exh. A-1 ¶ 25.i.
[96] *See* Exh. A-1 ¶ 26.

45.     Misappropriation of this type of information undermines KES's competitive position in the highly competitive industry of energy production solutions and services for exploration and production companies, including oil and gas well servicing.

46.     Upon information and belief, Bertrand misappropriated KES's trade secrets in order to benefit himself through his employment with Axis, a competitor of KES.

47.     Upon information and belief, Bertrand is presently employed as a vice president of Axis.

48.     Bertrand's conduct is knowing, willful, intentional, malicious, unprivileged, in bad faith, and caused — and will continue to cause — immediate and irreparable harm to KES, as well as causing KES to suffer compensatory damages in an amount to be proved at trial.

49.     Pursuant to § 1836(b)(3)(A) of the Defend Trade Secrets Act, KES is entitled to injunctive relief from this Court. KES will suffer irreparable harm if the Court does not enter a temporary restraining order and preliminary injunction against the Defendants as set forth, *infra*, in paragraph 80.

## COUNT II – BERTRAND AND AXIS

### Violation of the Texas Uniform Trade Secrets Act
### Tex. Civ. Prac. & Rem. Code § 134A

50.     KES incorporates by reference the preceding paragraphs of this Original Complaint as if fully set forth herein.

51.    By virtue of his employment relationship with KES, Bertrand was obligated to maintain the confidentiality of KES's trade secrets.

52.    KES's trade secrets are kept confidential and are not publicly disclosed, and KES derives value from the confidentiality of such information.

53.    Upon information and belief, Bertrand has misappropriated KES's trade secrets in violation of the Texas Uniform Trade Secrets Act.  Bertrand then immediately began employment as a vice president of KES's direct competitor, Axis.

54.    Upon information and belief, Bertrand has used, or inevitably will use and/or disclose, KES's trade secrets as a vice president of Axis, a competitor of KES.

55.    This misappropriation is unauthorized and conducted with the specific intent to harm KES and exploit KES's competitive position in the highly competitive industry of energy production solutions and services for exploration and production companies, including oil and gas well servicing.

56.    Bertrand's actions have been deliberate, willful, and malicious.

57.    As a direct and proximate result of Bertrand's misappropriation of Key's trade secrets, KES has suffered and will continue to suffer actual damages, and Defendants have been unjustly enriched as a result.

58.    The threatened and actual injuries that KES has suffered or will suffer are immediate and irreparable. Because of the difficulty in quantifying injury and harm to KES ability to compete, acquire, and maintain a competitive advantage through its trade secrets and Bertrand's wrongful use of such information, monetary damages alone will not adequately compensate KES for Bertrand's misappropriation and use/inevitable

disclosure of KES's trade secrets.   KES, therefore, lacks an adequate and complete remedy at law and an equitable remedy is appropriate in addition to monetary damages.

59.    Pursuant to § 134A.003 of the Texas Civil Practice and Remedies Code, KES is entitled to injunctive relief from this Court.   KES will suffer irreparable harm if the Court does not enter a temporary restraining order and preliminary injunction against the Defendants, as set forth, *infra*, in paragraph 80.

## COUNT III - BERTRAND
**Breach of Contract**

60.    KES incorporates by reference the preceding paragraphs of this Original Complaint as if fully set forth herein.

61.    Bertrand and Key Energy Services, Inc. entered into the Agreement, which is a valid and binding contract.  KES performed its obligations under the Agreement and all conditions precedent have occurred or have been performed.

62.    Bertrand has breached, and continues to breach multiple terms of the Agreement.

63.    Under the terms of the Agreement, Bertrand agreed and was obligated to return KES's Confidential Information (as defined in the Agreement) upon his termination of employment from KES.

64.    Bertrand has materially breached the Agreement by copying KES's Confidential Information (as defined in the Agreement) to removable drives, which he retained upon the termination of his employment from KES.

65.     Under the terms of the Agreement, Bertrand agreed and was obligated not to disclose or use KES's Confidential Information (as defined in the Agreement) except for the benefit of KES or with KES's consent.

66.     Bertrand has materially breached the Agreement by copying KES's Confidential Information (as defined in the Agreement) to removable drives, which he retained upon the termination of his employment from KES.

67.     Under the terms of the Agreement, for the twelve months following the termination of his employment, Bertrand agreed and was obligated not to solicit, canvass, approach, encourage, entice or induce any employee or contractor of KES to terminate his, her or its employment or engagement therewith.

68.     Bertrand has materially breached the Agreement by soliciting, approaching, encouraging, enticing and/or inducing KES employees to terminate their employment with KES.

69.     Under the terms of the Agreement, for the twelve months following the termination of his employment, Bertrand agreed and was obligated not to engage in or carry on within the Market Area in competition KES in any aspect of the Business (as defined in the Agreement).  The Agreement defines the Market Area as:

> "**Market Area**" means: onshore land areas in the Continental United States in (a) *each county in which [Bertrand] was based or performed material services on behalf of the Company* or any of its subsidiaries; and (b) each of the following basins and oil and gas shale plays: *Bakken*, Barnett, Denver-Julesberg, *Eagle Ford*, Fayetteville, Granite Wash, *Haynesville*, Marcellus, Mississippi Lime, Niobrara, Permian, *Powder River*, SCOOP, STACK, Tuscaloosa, Williston, and Woodford; *provided, however*, a basin or play shall not be included within the Market Area if: (1) the Participant had no direct or indirect responsibilities with respect to such basin or play

during the last 24 months of the Participant's employment or engagement with the Company or any of its subsidiaries, or (2) the Participant obtained no Confidential Information with respect the Company's or any of its subsidiaries' Business in such basin or play. [97]

70.     Bertrand has materially breached the Agreement by beginning employment with Axis.  Bertrand was based in and performed material services on behalf of KES in the Permian Basin, was based in and performed material services in Ector County and Midland County, and performed material services in the Haynesville, Eagle Ford, Brazos River Valley, Powder River, and Bakken Basins, as well as in Webb County.

71.     The Permian Basin affects the following Texas counties: Andrews, Borden, Brewster, Cochran, Coke, Concho, Cottle, Crane, Crockett, Crosby, Culberson, Dawson, Dickens, Ector, Edwards, El Paso, Fisher, Floyd, Gaines, Garza, Glasscock, Hale, Hockley, Howard, Hudspeth, Irion, Jeff Davis, Loving, Lubbock, Lynn, Martin, McCulloch, Midland, Mitchell, Motley, Nolan, Pecos, Reagan, Reeves, Schleicher, Scurry, Sterling, Stonewall, Sutton, Terrell, Terry, Tom Green, Upton, Val Verde, Ward, Winkler, and Yoakum.  The Permian Basin also affects the following New Mexico counties: Eddy and Lea.

72.     Since August 2019, Bertrand had direct or indirect responsibilities for and/or had access to Confidential Information with respect to KES's business in the following basins and plays: Permian, Haynesville, Eagle Ford, Brazos River Valley, Powder River, and Bakken Basins.

---

[97] *See* Exh. A-1 p. 14 ¶ 4.c.iii (emphasis added).

73.     Bertrand's new employer, Axis, maintains a presence and operations in the following basins and plays: Bakken, Eagle Ford, Haynesville, Marcellus, Permian, and SCOOP / STACK.

74.     As a proximate result of Bertrand's actions, KES will suffer, and continue to suffer, harm which cannot be adequately compensated by monetary damages alone.

75.     Under the Agreement, Bertrand agreed that KES was permitted to enforce the covenants of the Agreement, in the event of a breach, by injunctions and restraining orders, in addition to other rights and remedies available to KES at law and equity.

> **6. Specific Performance**. Because of the difficulty of measuring economic losses to the Company and its subsidiaries as a result of a breach of the foregoing covenants, and because of the immediate and irreparable damage that would be caused to the Company and its subsidiaries for which it would have no other adequate remedy, the Participant agrees that the Company and each of its subsidiaries shall be entitled to enforce the foregoing covenants, in the event of a breach, by injunctions and restraining orders and that such enforcement shall not be the Company's or its subsidiaries' exclusive remedy for a breach but instead shall be in addition to all other rights and remedies available to the Company and its subsidiaries, at law and equity. [98]

76.     Monetary damages will not fully compensate KES for Bertrand's breaches. KES will suffer irreparable harm if the Court does not enter a temporary restraining order and preliminary injunction against Bertrand, as set forth, *infra*, paragraph 80.

### COUNT V - AXIS
### Tortious Interference with Existing Contract

77.     KES incorporates by reference the preceding paragraphs of this Original Complaint as if fully set forth herein.

---

[98] *See* Exh. A-1 p. 14 ¶ 6.

78.     Bertrand and Key Energy Services, Inc. are parties to the Agreement which is a valid and enforceable contract subject to inference.   Axis is not a party to the Agreement.

79.     Axis willfully and intentionally interfered with the Agreement, by, among other things, employing Bertrand to compete with KES in the Market Area (as defined in the Agreement).   As a result of Axis's tortious conduct, KES has suffered and continues to suffer damages.

**INJUNCTIVE RELIEF**

80.     KES respectfully prays that the Court enter a temporary restraining order, preliminary injunction, and permanent injunction against Bertrand and any one acting in concert with him, including Axis, as follows:

    a.     Requiring Bertrand to immediately return and deliver to KES all KES Confidential Information (defined below) and KES Trade Secrets (defined below) that originated from KES or was acquired by or disclosed to Bertrand during his employment with  KES.

        i.     "KES's Confidential Information" means documents and information that (i) originated from; (ii) were acquired by or disclosed to Bertrand during his employment with any KES entity; or (iii) relate to the business or properties, products or services of KES reflecting:

           1.     KES personnel and those employees' names, roles, hire dates, statues, annual salaries, and changes in salaries;

           2.     KES work logs and labor employed at KES sites;

           3.     KES organizational charts;

           4.     KES vendor receipts; and

           5.     KES vendor pricing.

ii.     "KES's Trade Secrets" means documents and information that (i) originated from; (ii) were acquired by or disclosed to Bertrand during his employment with any KES entity; or (iii) relate to the business or properties, products or services of KES reflecting:

1.      KES well plugging specifications;

2.      KES common operating guidelines;

3.      KES processes, and procedures for performing KES services;

4.      KES customer lists, contact information, and work history with KES;

5.      KES specifications for specific customer wells;

6.      KES vendor and supplier lists;

7.      KES vendor and supplier expenses and history with KES;

8.      KES's financial information about KES operations;

9.      KES revenue projections;

10.     KES revenue data and reports;

11.     KES pricing sheets, pricing information, and pricing strategies;

12.     KES profit and loss statements (by customer, business line, KES entity, and for the Company overall);

13.     KES expenses, materials costs, and labor costs;

14.     KES customer bids, proposals, and bid methodologies;

15.     KES labor, inspection, and equipment rates;

16.     KES terms and conditions;

17.     KES collection terms;

18.     KES business plans and commercial strategies;

19.  KES customer mixes;

20.  KES customer weight (i.e., attribution of revenue to individual customers);

21.  KES business cases;

22.  KES staffing strategies for completion yard(s); and

23.  KES Project AFE Requests.

b.  Requiring Axis and Bertrand to preserve, and not destroy, delete or alter all physical copies and electronically stored KES Confidential Information and KES Trade Secrets.

c.  Requiring Axis and Bertrand provide any electronic device Bertrand used while employed by KES, to a third-party forensic vendor, RICOH USA, for electronic imaging, including the following devices:

i.  Storage Device: USB DISK 2.0, Serial #: 070192E05BB2A629;

ii.  Storage Device: USB DISK 2.0, Serial #: 070192EF2BEAA862;

iii.  Storage Device: General UDisk, Serial #: 404291539352803987500;

iv.  Storage Device: General USB Flash Disk, Serial #: 000000000000020C; and

v.  Storage Device: Kingston DataTraveler 2.0, Serial #: 89980116200801151425IE58.

d.  Enjoining Axis and Bertrand from, using or disclosing to any person or entity KES Confidential Information and KES Trade Secrets.

e.  Until a hearing on Plaintiff's Application for Preliminary Injunction or other Order amending the temporary restraining order, enjoining Bertrand from engaging in or carrying on in competition of KES's Services (defined below) to customers in the Restricted Area (defined below).

       i.       "<u>Restricted Area</u>" means Midland County, Ector County, Webb County, and the Bakken, Eagle Ford, Haynesville, Permian, and Powder River Basins.

       ii.      "<u>Services</u>" means the well plugging and abandonment, remedial cementing, acidizing services, completions, and salt water disposal services that Bertrand performed for KES during his employment with the Company.

f.      Until a hearing on Plaintiff's Application for Temporary Injunction or other Order amending this TRO, enjoining Bertrand, from providing Services in the Restricted Area for any KES customer identified in the KES Trade Secrets

g.      Until a hearing on Plaintiff's Application for Temporary Injunction or other Order amending the temporary injunction order, enjoining Bertrand from soliciting, canvassing, approaching, encouraging, enticing, or inducing any employee terminate his, her, employment with KES.

## PRAYER FOR RELIEF

WHEREFORE, Key Energy Services, Inc. and Key Energy Services, LLC respectfully request that this Court award the following:

1.      A temporary restraining order and preliminary injunction against Bertrand and Axis in the form specified above and stated in the Application for Temporary Restraining Order and Temporary Injunction.

2.      A permanent injunction enforcing the aforementioned relief;

3.      A money judgment for all actual damages sustained by KES in an amount to be proved at trial;

4.      Reasonable and necessary attorney's fees and costs of this action;

5.      Costs of court incurred by KES;

6.      Pre-judgment and post-judgment interest on the above amounts; and

7.      Such other and further relief as the Court may deem just and proper either in law or in equity.

Dated: <u>August 17, 2021</u>

Respectfully Submitted,

WEYCER, KAPLAN, PULASKI &
ZUBER, P.C.

By: <u>*/s/ Mark J. Levine*</u>
    Mark J. Levine
    State Bar No. 00791102
    mlevine@wkpz.com
    Megan R. Brannigan
    State Bar No. 24092166
    mbrannigan@wkpz.com
    24 Greenway Plaza, Suite 2050
    Houston, Texas 77046
    Telephone: (713) 961-9045
    Facsimile: (713) 961-5341

-- and –

ATKINS, HOLLMANN, JONES,
PEACOCK, LEWIS & LYON, INC.

    Murray A. "Trey" Crutcher, III
    State Bar No. 24028169
    3800 E. 42nd Street, Suite 500
    Odessa, Texas 79762
    Telephone: (432) 363-1300
    Facsimile: (432) 363-1310
    tcrutcher@odessalawfirm.com

***ATTORNEYS FOR PLAINTIFFS***
***KEY ENERGY SERVICES, INC. AND***
***KEY ENERGY SERVICES, LLC***